## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| NANCINA POPE, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | Civil Action: 3:23-cv-234 |
| | § | |
| | § | With Jury Demand Endorsed |
| EQUIFAX INFORMATION SERVICES LLC, | § | |
| EXPERIAN INFORMATION SOLUTIONS, | § | |
| Inc., TRANS UNION LLC, JP MORGAN | § | |
| CHASE BANK NA, COMMUNITY LOAN | § | |
| SERVICING LLC, and SELENE FINANCE | § | |
| LP | § | |
| | § | |
| Defendants. | § | |

---

## COMPLAINT

TO THE HONORABLE UNITED STATES DISTRICT COURT JUDGE:

Plaintiff, Nancina Pope ("Plaintiff"), by and through counsel, for her Complaint against Defendants, Equifax Information Services LLC, Experian Information Solutions, Inc., Trans Union LLC, JP Morgan Chase Bank NA, Community Loan Servicing LLC, and Selene Finance LP, jointly, severally, and in solido, states as follows:

### I. INTRODUCTION

1.    Three of the Defendants are consumer reporting agencies ("CRAs") as defined by 15 U.S.C. § 1681a(f), and Defendants, JP Morgan Chase Bank NA, Community Loan Servicing LLC,

and Selene Finance LP are each furnishers of consumer information. All Defendants have violated 15 U.S.C. § 1681 *et seq.*, known as the Fair Credit Reporting Act (the "FCRA"). Plaintiff seeks to recover from Defendants actual, statutory, and punitive damages, injunctive relief, legal fees, and expenses.

## II. PARTIES

2.    Plaintiff, Nancina Pope, is a natural person residing in Mecklenburg County, North Carolina and is a "consumer," as defined by the FCRA, 15 U.S.C. § 1681a(c)**,** and is a victim of repeated false credit reporting.

**Made Defendants herein are**:

3.    Upon information and belief, Defendant Equifax Information Services LLC, which may also hereinafter be referred to as "Equifax," "Defendant," "Defendants," "CRA," "CRA Defendant," or "CRA Defendants" is a Georgia limited liability company that does substantial business in this judicial district and may be served by delivering a summons to its headquarters, 1550 Peachtree Street, Northwest, Atlanta, Georgia 30309.  Equifax is a nationwide consumer reporting agency ("CRA") as defined by 15 U.S.C. § 1681a(f). Equifax regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Equifax disburses such consumer reports to third parties of contract for monetary compensation.

4.    Upon information and belief, Defendant Experian Information Solutions, Inc., which may also hereinafter be referred to as "Experian", "Defendant," "Defendants," "CRA," or "CRA Defendant," or "CRA Defendants," is an Ohio corporation that does business in this judicial district

and may be served by delivering a summons to its headquarters, 475 Anton Blvd., Costa Mesa, California 92626. Experian is a nationwide CRA as defined by 15 U.S.C. § 1681a(f). Experian regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Experian disburses such consumer reports to third parties of contract for monetary compensation.

5.      Upon information and belief, Defendant Trans Union LLC, which may also hereinafter be referred to as "Trans Union", "Defendant," "Defendants," "CRA," "CRA Defendant," or "CRA Defendants" is an Illinois limited liability company that does business in this judicial district and may be served by delivering a summons to its headquarters, 555 West Adams Street, Chicago, Illinois 60681. Trans Union is a nationwide CRA as defined by 15 U.S.C. § 1681a(f). Trans Union regularly engages in the business of assembling, evaluating, and disbursing information concerning consumers for the purposes of furnishing "consumer reports" as defined by 15 U.S.C. § 1681a(f) to third parties. Trans Union disburses such consumer reports to third parties of contract for monetary compensation.

6.      Upon information and belief, Defendant JP Morgan Chase Bank NA, which may also hereinafter be referred to as "Chase," "Defendant," "Defendants," "Furnisher Defendant," or "Furnisher Defendants," is an Ohio corporation that does substantial business in this judicial district and may be served by delivering a summons to its Legal Department at its headquarters, 1111 Polaris Parkway, Columbus, OH 42340. JPMCB is a "person," as defined by the FCRA, 15 U.S.C. § 1681a(b), and a furnisher of consumer credit information to consumer reporting agencies.

7.     Upon information and belief, Community Loan Servicing LLC, which may also hereinafter be referred to as "CLS," "Defendant," "Defendants," "Furnisher Defendant," or "Furnisher Defendants," is a Florida limited liability company that does substantial business in this judicial district and may be served by delivering a summons to its Legal Department at its headquarters, 4425 Ponce de Leon Blvd., 5th Floor, Coral Gables, Florida 33146. Community Loan Servicing is a "person," as defined by the FCRA, 15 U.S.C. § 1681a(b), and a furnisher of consumer credit information to consumer reporting agencies.

8.     Upon information and belief, Defendant Selene Finance LP, which may also hereinafter be referred to as "Selene," "Defendant," "Defendants," "Furnisher Defendant," or "Furnisher Defendants," is an Texas company that does substantial business in this judicial district and may be served by delivering a summons to its Legal Department at its headquarters, 9990 Richmond Avenue, Suite 400, Houston, TX 77042. Selene is a "person," as defined by the FCRA, 15 U.S.C. § 1681a(b), and a furnisher of consumer credit information to consumer reporting agencies.

9.     As used herein, "consumer reporting agency," or "CRA," means any person which, for monetary fees, dues, or on a cooperative nonprofit basis, regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports (commonly referred to as "credit reports") to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports and is an entity in the business of collecting, maintaining and disseminating information regarding the credit-worthiness of individuals. CRAs specifically

include, but are not limited to, Equifax, Experian, and TransUnion.

## III.  JURISDICTION AND VENUE

10.    Plaintiff respectfully asserts that this Honorable Court has jurisdiction in this case arises under federal law. 28 U.S.C. § 1331, 1334, and 1367 and 15 U.S.C. § 1681(p). Plaintiff also asserts actions under states' laws which may be brought within the supplemental jurisdiction of this Court and Plaintiff respectfully requests that this Honorable Court exercise supplemental jurisdiction over said claims. 28 U.S.C. § 1367.

11.    Venue is proper in this District, because CRA Defendants and all Furnisher Defendants transact business in this District. Selene's headquarters is located in this judicial district, a substantial part of the conduct complained of occurred in this district, and various actions made basis of Plaintiff's claims against Defendants occurred in the Northern District of Texas as further described. 28 U.S.C. § 1391.

12. Venue is further proper in this District, because debtors and consumers residing in the Northern District of Texas customarily send disputes similar to the Plaintiff's disputes to the CRA Defendants who send to the Furnisher Defendants as part of their reinvestigations. Specifically, CRA Defendants entered into agreements with Selene in this judicial district to receive credit reporting data concerning Plaintiff. Any and all requests to investigate Plaintiff's dispute(s) sent from the CRA Defendants as part of their reinvestigation was submitted to Selene's headquarters and investigated by the furnisher Selene using Selene's resources located at or closely connected to this judicial district. Selene managed Plaintiff's mortgage from this judicial district including communicating amounts owed and conducting numerous communications via phone and letter.

# IV.  FACTUAL ALLEGATIONS

<u>Background Information for Plaintiff's Chase First Mortgage Account</u>

13.     Upon information and belief, in or around October 2005 Plaintiff secured a first mortgage loan for her property located at 6125 Dwightware Blvd., Charlotte, NC 28227.

14.     Sometime thereafter, Chase acquired Plaintiff's first mortgage loan and assigned loan number 465182630xxxx, hereinafter ("Chase First mortgage account").

15.     On April 11, 2016, Plaintiff filed for a Chapter 13 bankruptcy. A redacted copy of Plaintiff's Chapter 13 Bankruptcy Petition and Docket Report are each attached hereto as Exhibits "A" and "B".

16.     Sometime thereafter, Specialized Loan Servicing ("SLS") acquired the Chase First mortgage account and assigned loan number 101341xxxx hereinafter ("SLS First mortgage account").

17.     On October 26, 2020, Plaintiff was discharged from Chapter 13 Bankruptcy and excepted from discharge Plaintiff's SLS First mortgage account. A redacted copy of Plaintiff's Chapter 13 Discharge Order is attached hereto as Exhibit "C".

18.     Read in concert, Sections 1322(a)(2), 1322(b)(5), and 1328(a)(1) of the Bankruptcy Code, bar discharging home mortgage debts in a Chapter 13 Bankruptcy.

19.     On or around December 13, 2020, Plaintiff's Chapter 13 Bankruptcy was terminated. *See* Exhibit "A".

20.     On July 15, 2021, Warren L. Tadlock, Trustee for Plaintiff's Chapter 13 Bankruptcy,

filed a Chapter 13 Standing Trustee's Final Report and Account. A redacted copy of the Chapter 13 Standing Trustee's Final Report and Account is attached hereto as Exhibit "D".

21.    Throughout Plaintiff's Chapter 13 Bankruptcy, under direct or indirect order from the bankruptcy Trustee, timely monthly mortgage payments were made to the Chase First and SLS First mortgage accounts.

22.    Plaintiff's SLS mortgage account is still open and to this day Plaintiff continues to make timely and regular mortgage payments to the SLS First mortgage account.

Background Information for Plaintiff's CLS Second and Selene Second Mortgage Accounts

23.    Upon information and belief, in or around December 2007 Plaintiff secured a second mortgage loan for her property located at 6125 Dwightware Blvd., Charlotte, NC 28227.

24.    On or around April 11, 2016, the Plaintiff filed for Bankruptcy Protection under Chapter 13 of Title 11. *See* Exhibits "A" and "B".

25.    Sometime thereafter, CLS acquired Plaintiff's second mortgage loan and assigned loan number 628000176xxxx, hereinafter ("CLS Second mortgage account").

26.    CLS then transferred this CLS Second mortgage account to VAK Fund, hereinafter ("VAK Fund Second mortgage account").

27.    On October 26, 2020, Plaintiff was discharged from Chapter 13 Bankruptcy and excepted from discharge the VAK Fund Second mortgage account. *See* Exhibit "C".

28.    Read in concert, Sections 1322(a)(2), 1322(b)(5), and 1328(a)(1) of the Bankruptcy Code, bar discharging home mortgage debts in a Chapter 13 Bankruptcy.

29.    On or around December 13, 2020, Plaintiff's Chapter 13 Bankruptcy was terminated. *See* Exhibit "A".

30.     On July 15, 2021, Warren L. Tadlock, Trustee for Plaintiff's Chapter 13 Bankruptcy, filed a Chapter 13 Standing Trustee's Final Report and Account. See Exhibit "D".

31.     Throughout Plaintiff's Chapter 13 Bankruptcy, under direct or indirect order from the bankruptcy Trustee, timely monthly mortgage payments were made to the CLS Second and VAK Fund Second mortgage accounts.

32.     Upon information and belief, after discharge, Plaintiff's VAK Fund Second mortgage account was transferred to Selene and Selene assigned loan number 5380xxxx, hereinafter ("Selene Second mortgage account").

33.     Plaintiff's Selene Second mortgage account is still open and to this day and Plaintiff continues to make timely and regular mortgage payments to the Selene Second mortgage account.

<u>Credit Reporting for Plaintiff's Chase First Mortgage Account</u>

34.     Sometime in August 2022, Plaintiff pulled her credit reports and noticed that inaccurate information was reporting.

35.     A redacted copy of Plaintiff's August 2022 Tri-Merge Credit Report, which includes Plaintiff's Equifax, Experian, and Trans Union credit reports/consumer files, is attached hereto as Exhibit "E".

36.     Within the Tri-Merge credit report, Plaintiff noticed that Equifax reported the following inaccuracies for Plaintiff's Chase First mortgage: Equifax failed to update the reporting of the Chase First mortgage after Plaintiff's Chapter 13 Bankruptcy was discharged; reported a derogatory account status; and reported remarks referencing her bankruptcy in the creditor remarks section.

37.     This reporting is incorrect because Plaintiff completed the required payments through Plaintiff's Chapter 13 Bankruptcy, was successfully discharged, and excepted the Chase First and SLS First mortgage debts from being discharged; therefore, any suppression and/or references to old outdated remarks related to the filing of the Chapter 13 Bankruptcy should have been removed from the Chase First mortgage tradelines after the Chase First tradeline was either transferred or certainly after the Chapter 13 Bankruptcy was discharged.[1]

38.     Metro 2 guidelines require furnishers and/or credit reporting agencies to update the reporting of an account when the borrower associated to the account filed Chapter 13 Bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Once a consumer is discharged, Metro 2 reporting standards specifically require the removal of any referencing to a Chapter 13 Bankruptcy and suppression codes associated with bankruptcy reporting by submitting a CII code of "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's Chapter 13 Bankruptcy, and then continued reporting once a consumer is discharged.

39.     Metro 2 guidelines have been adopted by Equifax as the industry standards, and these industry standards are followed by Equifax.

40.     Within the Tri-Merge credit report, Plaintiff noticed that Experian reported the following inaccuracies for Plaintiff's Chase First mortgage: Experian failed to update the reporting

---

[1] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct consumer reporting agencies to remove any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

of the Chase First mortgage after Plaintiff's Chapter 13 Bankruptcy was discharged; reported a derogatory account status; and reported remarks referencing her bankruptcy in the creditor remarks section.

41.    This reporting is incorrect because Plaintiff completed the required payments through Plaintiff's Chapter 13 Bankruptcy, was successfully discharged, and excepted the Chase First and SLS First mortgage debts from being discharged; therefore, any suppression and/or references to old outdated remarks related to the filing of the Chapter 13 Bankruptcy should have been removed from the Chase First mortgage tradelines after the Chase First tradeline was either transferred or certainly after the Chapter 13 Bankruptcy was discharged.2

42.    Metro 2 guidelines require furnishers and/or credit reporting agencies to update the reporting of an account when the borrower associated to the account filed Chapter 13 Bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Once a consumer is discharged, Metro 2 reporting standards specifically require the removal of any referencing to a Chapter 13 Bankruptcy and suppression codes associated with bankruptcy reporting by submitting a CII code of "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's Chapter 13 Bankruptcy, and then continued reporting once a consumer is discharged.

43.    Metro 2 guidelines have been adopted by Experian as the industry standards, and

---

2 The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct consumer reporting agencies to remove any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

these industry standards are followed by Experian.

44.     Within the Tri-Merge credit report, Plaintiff noticed that Trans Union reported the following inaccuracies for Plaintiff's Chase First mortgage: Trans Union failed to update the reporting of the Chase First mortgage after Plaintiff's Chapter 13 Bankruptcy was discharged; reported a derogatory account status; and reported remarks referencing her bankruptcy in the creditor remarks section.

45.     This reporting is incorrect because Plaintiff completed the required payments through Plaintiff's Chapter 13 Bankruptcy, was successfully discharged, and excepted the Chase First and SLS First mortgage debts from being discharged; therefore, any suppression and/or references to old outdated remarks related to the filing of the Chapter 13 Bankruptcy should have been removed from the Chase First mortgage tradelines after the Chase First tradeline was either transferred or certainly after the Chapter 13 Bankruptcy was discharged.[3]

46.     Metro 2 guidelines require furnishers and/or credit reporting agencies to update the reporting of an account when the borrower associated to the account filed Chapter 13 Bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Once a consumer is discharged, Metro 2 reporting standards specifically require the removal of any referencing to a Chapter 13 Bankruptcy and suppression codes associated with bankruptcy reporting by submitting a CII code of "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it

---

[3] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct consumer reporting agencies to remove any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

prevents the reporting of any late payment history during the pendency of a consumer's Chapter 13 Bankruptcy, and then continued reporting once a consumer is discharged.

47.    Metro 2 guidelines have been adopted by Trans Union as the industry standards, and these industry standards are followed by Trans Union.

### Credit Reporting for Plaintiff's CLS Second Mortgage

48.    Within the Tri-Merge credit report, Plaintiff noticed that Equifax reported the following inaccuracies for Plaintiff's CLS Second mortgage: Equifax failed to update the reporting of the CLS Second mortgage after Plaintiff's Chapter 13 Bankruptcy was discharged; reported an account status "derogatory"; payment status "wage earner plan"; and reported within the creditor remarks section references to Plaintiff's Chapter 13 Bankruptcy, despite the Plaintiff having been discharged from Chapter 13 Bankruptcy.

49.    This reporting is incorrect because Plaintiff completed the required payments through Plaintiff's Chapter 13 Bankruptcy, was successfully discharged, and excepted the CLS Second and VAK Fund Second mortgage debts from being discharged; therefore, any remarks and/or references to a Chapter 13 Bankruptcy should have been removed from the CLS Second mortgage tradeline at the time it was transferred to VAK Fund but certainly after the Chapter 13 Bankruptcy was discharged.[4]

50.    Metro 2 guidelines require furnishers and/or credit reporting agencies to update the

---

[4] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct consumer reporting agencies to remove any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

reporting of an account when the borrower associated to the account filed Chapter 13 Bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Once a consumer is discharged, Metro 2 reporting standards specifically require the removal of any referencing to a Chapter 13 Bankruptcy and suppression codes associated with bankruptcy reporting by submitting a CII code of "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's Chapter 13 Bankruptcy, and then continued reporting once a consumer is discharged.

51.     Metro 2 guidelines have been adopted by Equifax as the industry standards, and these industry standards are followed by Equifax.

52.     Within the Tri-Merge credit report, Plaintiff noticed that Experian reported the following inaccuracies for Plaintiff's CLS Second mortgage: Experian failed to update the reporting of the CLS Second mortgage after Plaintiff's Chapter 13 Bankruptcy was discharged; reported an account status "derogatory"; payment status "wage earner plan"; and reported within the creditor remarks section references to Plaintiff's Chapter 13 Bankruptcy, despite the Plaintiff having been discharged from Chapter 13 Bankruptcy.

53.     This reporting is incorrect because Plaintiff completed the required payments through Plaintiff's Chapter 13 Bankruptcy, was successfully discharged, and excepted the CLS Second and VAK Fund Second mortgage debts from being discharged; therefore, any remarks and/or references to a Chapter 13 Bankruptcy should have been removed from the CLS Second mortgage tradeline at the time it was transferred to VAK Fund but certainly after the Chapter 13

Bankruptcy was discharged.5

54.     Metro 2 guidelines require furnishers and/or credit reporting agencies to update the reporting of an account when the borrower associated to the account filed Chapter 13 Bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Once a consumer is discharged, Metro 2 reporting standards specifically require the removal of any referencing to a Chapter 13 Bankruptcy and suppression codes associated with bankruptcy reporting by submitting a CII code of "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's Chapter 13 Bankruptcy, and then continued reporting once a consumer is discharged.

55.     Metro 2 guidelines have been adopted by Experian as the industry standards, and these industry standards are followed by Experian.

56.     Within the Tri-Merge credit report, Plaintiff noticed that Trans Union reported the following inaccuracies for Plaintiff's CLS Second mortgage: Trans Union failed to update the reporting of the CLS Second mortgage after Plaintiff's Chapter 13 Bankruptcy was discharged; reported an account status "derogatory"; payment status "wage earner plan"; and reported within the creditor remarks section references to Plaintiff's Chapter 13 Bankruptcy, despite the Plaintiff having been discharged from Chapter 13 Bankruptcy.

57.     This reporting is incorrect because Plaintiff completed the required payments

---

[5] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct consumer reporting agencies to remove any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

through Plaintiff's Chapter 13 Bankruptcy, was successfully discharged, and excepted the CLS Second and VAK Fund Second mortgage debts from being discharged; therefore, any remarks and/or references to a Chapter 13 Bankruptcy should have been removed from the CLS Second mortgage tradeline at the time it was transferred to VAK Fund but certainly after the Chapter 13 Bankruptcy was discharged.6

58.    Metro 2 guidelines require furnishers and/or credit reporting agencies to update the reporting of an account when the borrower associated to the account filed Chapter 13 Bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Once a consumer is discharged, Metro 2 reporting standards specifically require the removal of any referencing to a Chapter 13 Bankruptcy and suppression codes associated with bankruptcy reporting by submitting a CII code of "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's Chapter 13 Bankruptcy, and then continued reporting once a consumer is discharged.

59.    Metro 2 guidelines have been adopted by Trans Union as the industry standards, and these industry standards are followed by Trans Union.

<u>Credit Reporting for Plaintiff's Selene Second Mortgage</u>

60.    Within the Tri-Merge credit report, Plaintiff noticed that Trans Union reported the following inaccuracies for Plaintiff's Selene Second mortgage: Trans Union failed to update the

---

6 The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct consumer reporting agencies to remove any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

reporting of the Selene Second mortgage after Plaintiff's Chapter 13 Bankruptcy was discharged; reported an account status "derogatory"; payment status "wage earner plan"; and reported within the creditor remarks section references to Plaintiff's Chapter 13 Bankruptcy, despite the Plaintiff having been discharged from Chapter 13 Bankruptcy.

61.    This reporting is incorrect because Plaintiff completed the required payments through Plaintiff's Chapter 13 Bankruptcy, was successfully discharged, and excepted the CLS Second and VAK Fund Second mortgage debts from being discharged; therefore, any remarks and/or references to a Chapter 13 Bankruptcy should have been removed from the CLS Second mortgage tradeline at the time it was transferred to VAK Fund but certainly after the Chapter 13 Bankruptcy was discharged and the VAK Fund Second Mortgage was transferred to Selene where the Plaintiff is now making her current and ongoing payments after discharge.[7]

62.    Metro 2 guidelines require furnishers and/or credit reporting agencies to update the reporting of an account when the borrower associated to the account filed Chapter 13 Bankruptcy by first updating the Consumer Information Indicator ("CII") to "D", and then continuing to furnish the monthly payment history information with a value of "D". Once a consumer is discharged, Metro 2 reporting standards specifically require the removal of any referencing to a Chapter 13 Bankruptcy and suppression codes associated with bankruptcy reporting by submitting a CII code of "Q". In following these simple Metro 2 guidelines, which are well regarded as the industry standards, it prevents the reporting of any late payment history during the pendency of a consumer's Chapter 13

---

[7] The Consumer Data Industry Association's Metro 2 reporting standards specifically instruct consumer reporting agencies to remove any bankruptcy references or suppression codes associated with bankruptcy reporting so that ongoing payments made by the consumer can be reported.

Bankruptcy, and then continued reporting once a consumer is discharged.

63.     Metro 2 guidelines have been adopted by Trans Union as the industry standards, and these industry standards are followed by Trans Union.

<u>Credit Reporting Dispute Letters and Reinvestigation Requests</u>

64.     On or about August 2022, the Plaintiff disputed the reporting of above referenced mortgage accounts with Equifax, Experian, and Trans Union directly.

65.     Plaintiff specifically disputed the reporting of the Chase First mortgage and the CLS Second mortgage accounts with Defendant Equifax directly. A redacted copy of Plaintiff's Dispute Letter to Equifax is attached hereto as Exhibit "F".

66.     Plaintiff requested that under the FCRA, Defendant Equifax conduct a reasonable investigation and/or remedy the inaccuracies on Plaintiff's credit report concerning the Chase First mortgage and the CLS Second mortgage accounts.

67.     Equifax responded to Plaintiff's dispute on October 7, 2022, and within the Equifax credit report Plaintiff noticed that the same issues remained for the Chase First mortgage and the CLS Second mortgage accounts. A redacted copy of Equifax's response is attached hereto as Exhibit "G".

68.     Plaintiff obtained a new tri-merge credit report in October 2022 and verified that the Chase First and CLS Second mortgage accounts were still inaccurate. A redacted copy of Plaintiff's October 28, 2022, three-bureau credit report is attached hereto as Exhibit "H".

69.     Equifax's response, or lack thereof, was not the result of a reasonable investigation

into Plaintiff's dispute and failed to remedy the inaccuracies within the Chase First mortgage and the CLS Second mortgage accounts and gave no explanation as to why both accounts were not modified.

70.    Plaintiff's inaccurate Equifax consumer report was disseminated to third parties before and/or after the instant dispute.

71.    Equifax chose to "verify" false information from an unreliable source, failed to correct the inaccurate information, and inappropriately deleted Plaintiff's Chase First mortgage and the CLS Second mortgage accounts.

72.    Upon the Plaintiff's request to Equifax for verification and correction regarding both accounts, and in accordance with Equifax's standard procedures, Equifax did not evaluate or consider any of Plaintiff's information, claims or evidence, and did not make any attempt to substantially or reasonably verify the reporting of both accounts.

73.    Equifax has adopted the Metro 2 reporting standards, Equifax deviated from the standards based on its conduct in this case, and by Equifax deviating from the adopted standards, Equifax injured Plaintiff's credit standing and/or worthiness.

74.    In the alternative, Equifax failed to contact the furnishers, therefore, failed to perform any investigation at all.

75.    In the alternative to the allegation that Equifax failed to contact the furnishers, it is alleged that Equifax did forward some notice of the dispute to the furnishers, and Chase and CLS failed to conduct a lawful investigation.

76.    Plaintiff specifically disputed the reporting of the Chase First mortgage and the CLS Second mortgage accounts with Defendant Experian directly.

77.    Plaintiff requested that under the FCRA, Defendant Experian conduct a reasonable investigation and/or remedy the inaccuracies on Plaintiff's credit report concerning the Chase First mortgage and the CLS Second mortgage accounts.

78.    A redacted copy of Plaintiff's dispute letter to Experian, is attached hereto as Exhibit "I".

79.    Experian responded to Plaintiff's dispute on September 13, 2022. and within the Experian response Plaintiff noticed that the Chase First mortgage and the CLS Second mortgage tradelines still reported with the same issues. A redacted copy of Experian's response is attached hereto as Exhibit "J".

80.    Plaintiff obtained a new tri-merge credit report in October 2022 and did see that Experian may have fixed the Chase First mortgage account although this does not conform Experian's actual response. *See* Exhibits "H" and "J".

81.    Plaintiff also noticed on the October 2022 credit report that indeed, Experian still reported the CLS Second mortgage with the same issues. See Exhibits "H" and "J".

82.    Experian failed to accurately update the reporting for the Chase First and CLS Second mortgage accounts.

83.    Experian continued to report for the Chase First and CLS Second mortgage accounts a derogatory status and bankruptcy remarks even though she was discharged.

84.    Experian's response, or lack thereof, was not the result of a reasonable investigation into Plaintiff's dispute and failed to remedy the inaccuracies within the Chase First and CLS Second mortgage accounts and gave no explanation as to why this account was reporting inaccurately.

85.    Plaintiff's inaccurate Experian consumer report was disseminated to third parties

before and/or after the instant dispute.

86.    Experian chose to "verify" false information from unreliable sources, failed to correct the inaccurate information, and continued to publish the inaccurate information regarding Plaintiff's Chase First and CLS Second mortgage accounts.

87.    Upon the Plaintiff's request to Experian for verification and correction regarding the Chase First and CLS Second mortgage accounts, and in accordance with Experian's standard procedures, Experian did not evaluate or consider any of Plaintiff's information, claims or evidence, and did not make any attempt to substantially or reasonably verify the reporting of the Chase First and CLS Second mortgage accounts.

88.    Experian has adopted the Metro 2 reporting standards, Experian deviated from the standards based on its conduct in this case, and by Experian deviating from the adopted standards, Experian injured Plaintiff's credit standing and/or worthiness.

89.    In the alternative, Experian failed to contact the furnishers, therefore, failed to perform any investigation at all.

90.    In the alternative to the allegation that Experian failed to contact Chase and/or CLS, it is alleged that Experian did forward some notice of the dispute to Chase and/or CLS, and Chase and CLS failed to conduct a lawful investigation.

91.    Plaintiff specifically disputed the reporting of the Chase First, CLS Second, and Selene Second mortgage accounts with Defendant Trans Union directly.

92.    Plaintiff requested that under the FCRA, Defendant Trans Union conduct a reasonable investigation and/or remedy the inaccuracies on Plaintiff's credit report concerning the Chase First, CLS Second, and Selene Second mortgage accounts.

93.     A redacted copy of Plaintiff's dispute letter to Trans Union, is attached hereto as Exhibit "K".

94.     Trans Union responded on October 9, 2022 and fixed the issues concerning the Chase First mortgage account but deleted rather than modified the CLS Second and Selene Second mortgage tradelines. A redacted copy of Trans Union's response is attached hereto as Exhibit "L".

95.     Plaintiff obtained a new tri-merge credit report in October 2022 and verified the Trans Union response. See Exhibit "H".

96.     Trans Union failed to accurately update the reporting for the CLS Second and Selene Second mortgage tradelines because they were deleted rather than modified.

97.     Trans Union's response, or lack thereof, was not the result of a reasonable investigation into Plaintiff's dispute and failed to remedy the inaccuracies within the CLS Second and Selene Second mortgage accounts and gave no explanation as to why the accounts were deleted.

98.     Plaintiff's inaccurate Trans Union consumer report was disseminated to third parties before and/or after the instant dispute.

99.     Trans Union chose to "verify" false information from unreliable sources, failed to correct the inaccurate information, and inappropriately deleted Plaintiff's CLS Second and Selene Second mortgage accounts.

100.     Upon the Plaintiff's request to Trans Union for verification and correction regarding the CLS Second and Selene Second mortgage accounts, and in accordance with Trans Union's standard procedures, Trans Union did not evaluate or consider any of Plaintiff's information, claims or evidence, and did not make any attempt to substantially or reasonably verify the reporting of the CLS Second and Selene Second mortgage accounts.

101.    Trans Union has adopted the Metro 2 reporting standards, Trans Union deviated from the standards based on its conduct in this case, and by Trans Union deviating from the adopted standards, Trans Union injured Plaintiff's credit standing and/or worthiness.

102.    In the alternative, Trans Union failed to contact CLS and/or Selene, therefore, failed to perform any investigation at all.

103.    In the alternative to the allegation that Trans Union failed to contact CLS and/or Selene, it is alleged that Trans Union did forward some notice of the dispute to CLS and/or Selene, and CLS and/or Selene failed to conduct a lawful investigation.

## V.  GROUNDS FOR RELIEF

### COUNT I – EQUIFAX'S VIOLATION OF THE FCRA
### (15 U.S.C. § 1681e(b))

104.    The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

105.    Equifax violated 15 U.S.C. § 168le(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiff.

106.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible **accuracy** of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

107.    Plaintiff furnished Equifax the necessary documentation supporting Plaintiff's tradelines, yet Equifax continued to prepare a patently false consumer report concerning Plaintiff.

108.    Despite actual and implied knowledge that Plaintiff's credit reports were and are not

accurate, Equifax readily provided false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

109.    After Equifax knew or should have known Plaintiff's account statuses in relation to his bankruptcy were inaccurate, they failed to make the corrections.

110.    As a result of Equifax's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to, denial in attempts to refinance, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

111.    Equifax's conduct, action, and inaction, were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction, were negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

112.    The Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

### COUNT II – EQUIFAX'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681i)

113.    The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

114.    Equifax violated § 1681i by failing to update inaccurate information in the Plaintiff's credit files after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit files, and relying upon verification from a source it has reason to know is unreliable.

115.    As a result of Equifax's conduct, action, and inaction, the Plaintiff suffered damages,

including, but not limited to, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

116.    Equifax's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiff to recover actual damages under 15 U.S.C. § 1681o.

117.    The Plaintiff is entitled to recover costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

## COUNT III – EXPERIAN'S VIOLATION OF THE FCRA
### (15 U.S.C. § 1681e(b))

118.    The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

119.    Experian violated 15 U.S.C. § 168le(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiff.

120.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible **accuracy** of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

121.    Plaintiff furnished Experian the necessary documentation supporting Plaintiff's tradelines, yet Experian continued to prepare a patently false consumer report concerning Plaintiff.

122.    Despite actual and implied knowledge that Plaintiff's credit reports were and are not accurate, Experian readily provided false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

123.    After Experian knew or should have known Plaintiff's account status in relation to her bankruptcy was inaccurate, they failed to make the corrections.

124.    As a result of Experian's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to, denial in attempts to refinance, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

125.    Experian's conduct, action, and inaction, were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction, were negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

126.    The Plaintiff is entitled to recover costs and attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.


**COUNT IV – EXPERIAN'S VIOLATION OF THE FCRA**
**(15 U.S.C. §1681i)**


127.    The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

128.    Experian violated § 1681i by failing to update inaccurate information in the Plaintiff's credit files after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain

reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit files, and relying upon verification from a source it has reason to know is unreliable.

129.    As a result of Experian's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

130.    Experian's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiff to recover actual damages under 15 U.S.C. § 1681o.

131.    The Plaintiff is entitled to recover costs and attorney's fees from Experian in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

## COUNT V – TRANS UNION'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681e(b))

132.    The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

133.    Trans Union violated 15 U.S.C. § 168le(b) by failing to establish or follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit reports and credit files it published and maintained concerning the Plaintiff.

134.    The FCRA mandates that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible **accuracy** of the information concerning the individual about whom the report relates." 15 U.S.C. § 168le(b) (emphasis added).

135.    Plaintiff furnished Trans Union the necessary documentation supporting Plaintiff's tradelines, yet Trans Union continued to prepare a patently false consumer report concerning Plaintiff.

136.    Despite actual and implied knowledge that Plaintiff's credit reports were and are not accurate, Trans Union readily provided false reports to one or more third parties, thereby misrepresenting Plaintiff, and ultimately Plaintiff's creditworthiness.

137.    After Trans Union knew or should have known Plaintiff's account status in relation to his bankruptcy was inaccurate, they failed to make the corrections. Further, Plaintiff did not request for the mortgage tradelines to be deleted.

138.    As a result of Trans Union's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to, denial in attempts to refinance, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

139.    Trans Union's conduct, action, and inaction, were willful, rendering it liable to Plaintiff for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 168ln. In the alternative, such conduct, action, and inaction, were negligent, entitling the Plaintiff to recover under 15 U.S.C. § 1681o.

140.    The Plaintiff is entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

## COUNT VI – TRANS UNION'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681i)

141.    The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

142.    Trans Union violated § 1681i by failing to update inaccurate information in the

Plaintiff's credit files after receiving actual notice of such inaccuracies, failing to conduct a lawful reinvestigation, failing to forward all relevant information to furnisher(s), failing to maintain reasonable procedures with which to filter and verify disputed information in the Plaintiff's credit files, and relying upon verification from a source it has reason to know is unreliable.

143.     As a result of Trans Union's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

144.     Trans Union's conduct, action, and inaction, were willful, rendering it liable for actual or statutory damages, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, such conduct, action, and inaction were negligent entitling the Plaintiff to recover actual damages under 15 U.S.C. § 1681o.

145.     The Plaintiff is entitled to recover costs and attorney's fees from Trans Union in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or 1681o.

## COUNT VII – CHASE'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681s-2(b))

146.     The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

147.     Defendant Chase violated 15 U.S.C. § 1681s-2(b) by failing to conduct reasonable investigations upon receiving notice of Plaintiff's dispute(s) from one or more consumer reporting agencies, and/or failing to appropriately report the results of their investigations, and/or failing to appropriately modify the information.

148.    Chase further violated 15 U.S.C. § 1681s-2(b) by continuing to report the Chase representations within Plaintiff's credit files with the CRA Defendants without also including a notation that this debt was disputed, failing to fully and properly investigate the Plaintiff's dispute of the Chase representations, failing to accurately respond to the CRA Defendants, failing to correctly report results of an accurate investigation to every other consumer reporting agency, and failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the Chase representations to the consumer reporting agencies.

149.    As a result of Chase's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

150.    Chase's conduct, action, and inaction, were willful, rendering it liable for actual or statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent entitling the Plaintiff to recover actual damages under 15 U.S.C. § 1681o.

### COUNT VIII – CLS'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681s-2(b))

151.    The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

152.    Defendant CLS violated 15 U.S.C. § 1681s-2(b) by failing to conduct reasonable investigations upon receiving notice of Plaintiff's dispute(s) from one or more consumer reporting agencies, and/or failing to appropriately report the results of their investigations, and/or failing to appropriately modify the information.

153.    CLS further violated 15 U.S.C. § 1681s-2(b) by continuing to report the CLS representation within Plaintiff's credit files with the CRA Defendants without also including a notation that this debt was disputed, failing to fully and properly investigate the Plaintiff's dispute(s) of the CLS representations, failing to accurately respond to the CRA Defendants, failing to correctly report results of an accurate investigation to every other consumer reporting agency, and failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the CLS representation to the consumer reporting agencies.

154.    As a result of CLS's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

155.    CLS's conduct, action, and inaction, were willful, rendering it liable for actual or statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent entitling the Plaintiff to recover actual damages under 15 U.S.C. § 1681o.

### COUNT IX – SELENE'S VIOLATION OF THE FCRA
### (15 U.S.C. §1681s-2(b))

156.    The Plaintiff realleges and incorporates all paragraphs above as if fully set out herein.

157.    Defendant Selene violated 15 U.S.C. § 1681s-2(b) by failing to conduct reasonable investigations upon receiving notice of Plaintiff's dispute(s) from one or more consumer reporting agencies, and/or failing to appropriately report the results of their investigations, and/or failing to appropriately modify the information.

158.     Selene further violated 15 U.S.C. § 1681s-2(b) by continuing to report the Selene representations within Plaintiff's credit files with the CRA Defendants without also including a notation that this debt was disputed, failing to fully and properly investigate the Plaintiff's dispute(s) of the Selene representations, failing to accurately respond to the CRA Defendants, failing to correctly report results of an accurate investigation to every other consumer reporting agency, and failing to permanently and lawfully correct its own internal records to prevent the re-reporting of the Selene representations to the consumer reporting agencies.

159.     As a result of Selene's conduct, action, and inaction, the Plaintiff suffered damages, including, but not limited to, loss in ability to finance goods, loss of credit, loss of the ability to purchase and benefit from a credit, and suffering the mental and emotional pain, anguish, humiliation, and embarrassment of credit denials.

160.     Selene's conduct, action, and inaction, were willful, rendering it liable for actual or statutory, and punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, it was negligent entitling the Plaintiff to recover actual damages under 15 U.S.C. § 1681o.

## VI.  VICARIOUS LIABILITY/RESPONDEAT SUPERIOR

161.     Plaintiff will be able to show, after reasonable discovery, that all actions at issue were taken by employees, agents, servants, or representatives, of any type, for Defendants, the principals, within the line and scope of such individuals' (or entities') express or implied authority, through employment, agency, or representation, which imputes liability to Defendants for all such actions under the doctrine of respondeat superior and/or vicarious liability.

## VII. DAMAGES

162.    Plaintiff respectfully requests that this Honorable Court instruct the jury, as the trier of facts, that in addition to actual or compensatory damages, punitive or exemplary damages may be awarded against the Defendants under the provisions of the FCRA and/or states' laws, including Texas.

163.    Plaintiff respectfully requests that this Honorable Court award Plaintiff his litigation expenses and other costs of litigation and reasonable attorney's fees incurred in this litigation, in accordance with the provisions of the FCRA and/or other laws.

164.    The above and foregoing actions, inactions, and fault of Defendants, as to each and every claim, have proximately caused a wide variety of damages to Plaintiff.

165.    Defendants performed perfunctory and essentially useless reinvestigations resulting in the verification of false reportings about the Plaintiff and have been a substantial factor in causing credit denials and other damages.

166.    Plaintiff suffered a variety of damages, including economic and non-economic damages as prayed for herein.

167.    Defendants have negligently and/or willfully violated various provisions of the FCRA and are thereby liable unto Plaintiff.

168.    Defendants are liable unto Plaintiff for all actual, statutory, exemplary and punitive damages awarded in this case, as well as other demands and claims asserted herein including, but not limited to, out-of-pocket expenses, credit denials, costs and time of repairing their credit, pain and suffering, embarrassment, inconvenience, lost economic opportunity, loss of incidental time,

frustration, emotional distress, mental anguish, fear of personal and financial safety and security, attorney's fees, and court costs, and other assessments proper by law and any and all other applicable federal and state laws, together with legal interest thereon from date of judicial demand until paid.

**WHEREFORE PREMESIS CONSIDERED**, Plaintiff, Nancina Pope, prays that this Honorable Court:

A.    Enter Judgment in favor of Plaintiffs and against Defendants Equifax Information Services LLC**,** Experian Information Solutions, Inc., Trans Union LLC, JP Morgan Chase Bank NA, Community Loan Servicing LLC, and Selene Finance LP, jointly, severally, and in solido, for all reasonable damages sustained by Plaintiff, including, but not limited to, actual damages, compensatory damages, out-of-pocket expenses, credit denials, costs and time of repairing their credit, pain and suffering, embarrassment, inconvenience, lost economic opportunity, loss of incidental time, frustration, emotional distress, mental anguish, and fear of personal and financial safety and security for Defendants' violations of the FCRA, applicable state law, and common law;

B.    Find that the appropriate circumstances exist for an award of punitive damages to Plaintiff;

C.    Award Plaintiff pre-judgment and post-judgment interest, as allowed by law;

D.    Order that the CRA Defendants, Equifax Information Services LLC**,** Experian Information Solutions, Inc., and Trans Union LLC, and Furnisher Defendants, JP Morgan Chase Bank NA, Community Loan Servicing LLC, and Selene Finance LP, work in conjunction, cooperatively, and/or individually to reinvestigate and correct the consumer report(s), credit report(s), data

emanations, consumer histories, and credit histories of and concerning Plaintiff and/or any of Plaintiff's personal identifiers.

E.    Grant such other and further relief, in law or equity, to which Plaintiff might show she is justly entitled.

Date Filed: January 31, 2023

Respectfully submitted,

*/s/ Matthew P. Forsberg*
Matthew P. Forsberg
TX State Bar No. 24082581
Matt@FieldsLaw.com
FIELDS LAW FIRM
9999 Wayzata Blvd.
Minnetonka, Minnesota 55305
(612) 383-1868 (telephone)
(612) 370-4256 (fax)

**LAW OFFICE OF JONATHAN A. HEEPS**

*/s/ Jonathan A. Heeps* .
Jonathan A. Heeps
TX State Bar No. 24074387
LAW OFFICE OF JONATHAN A. HEEPS
Post Office Box 174372
Arlington, Texas 76003
Telephone (682) 738-6415
Fax (844) 738-6416
jaheeps@heepslaw.com

COUNSEL FOR PLAINTIFF

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all issues so triable.

January 31, 2023                              */s/ Matthew P. Forsberg*
Date                                          Matthew P. Forsberg